Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Companion Property Casualty Group is the Carrier on the risk.
3. An employee-employer relationship existed between Plaintiff and Defendant-Employer at all relevant times.
4. This dispute arises from an incident whereby Plaintiff was injured on or around April 8, 2002, while Plaintiff was working for his own business. Plaintiff was injured when he stepped in a hole, twisting his ankle and injuring his back. Defendants accepted this claim as compensable and the Defendant-Carrier has been paying Plaintiff weekly benefits and providing medical treatment since the time of the accident.
5. Prior to and continuing after his injury through the present time, Plaintiff's business paid monthly expenses on his behalf in the amount of approximately $5,000.00.
6. Defendants filed a Form 24 Application with the Commission on or around September 22, 2003.
7. After an informal hearing on Defendant's Form 24 Application, the Commission entered an Order on October 27, 2003 holding that the Commission was unable to reach a decision and that the matter should proceed to a formal evidentiary hearing.
8. Plaintiff is receiving weekly compensation checks in the amount of $654.00 since the date of the accident and continuing.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The sole issue for determination is whether Defendants' Form 24 Application to Stop Payment of Compensation should be granted. Specifically, in the pre-trial agreement, the parties stipulated the issue to be whether Plaintiff has returned to work and is earning any wages, income, or benefits that should be taken into consideration to offset his temporary total disability benefits.
2. Plaintiff was approximately forty-four years of age at the time of hearing before the Deputy Commissioner. Plaintiff is the sole owner of Defendant-Employer, Charles Adams Trucking. Defendant-Employer is a trucking and tobacco hauling business that Plaintiff has owned and operated since 1982.
3. This claim involves injuries Plaintiff sustained on April 8, 2002, when Plaintiff stepped in a hole, while carrying steel beams, twisting his ankle and hurting his back.
4. Defendants filed a Form 19 employer's report of employee's injury on April 26, 2002, and later filed a Form 25N notice to the commission of assignment of a rehabilitation professional on April 30, 2002. Plaintiff thereafter filed a Form 18 notice of accident to employer on February 19, 2003.
5. Subsequent to the accident, Plaintiff represented to the Carrier that he was disabled from earning wages and that his average weekly wage was $1200.00 to $1300.00. Plaintiff again made this representation on his Form 18. The Carrier accepted this claim as compensable and began paying Plaintiff weekly compensation benefits in the amount of $654.00, the maximum disability compensation rate at the time of the injury.
6. Plaintiff never received a designated amount as salary or wages from Defendant-Employer. Prior to his injury, Plaintiff paid all of his personal expenses totaling approximately $5,000.00 a month using the business accounts of Defendant-Employer. Subsequent to his injury, Plaintiff continued to pay his personal expenses out of the business account.
7. Plaintiff received medical treatment for his injuries, which the Carrier paid. On February 21, 2003, Defendants filed a motion to compel Plaintiff to comply with medical treatment. On March 28, 2003, the Commission filed an order directing Plaintiff to comply with medical treatment.
8. Defendants filed a Form 24 application on September 22, 2003, seeking termination of Plaintiff's temporary total disability benefits on the grounds that Plaintiff had failed to comply with medical treatment and that Plaintiff had returned to work and no longer suffered a diminution in wage earning capacity. Plaintiff filed a response objecting to Defendants' Form 24 application and a hearing was held before a Special Deputy Commissioner on October 23, 2003. The Special Deputy Commissioner filed an order on October 27, 2003, holding that the Commission was unable to reach a decision and the matter would proceed to a formal hearing before a Deputy Commissioner. The matter was heard before Deputy Commissioner Philip A. Baddour, III, on January 13, 2004. The Deputy Commissioner approved the Form 24 application by Opinion and Award filed October 21, 2004, and terminated Plaintiff's disability benefits as of September 22, 2003.
9. Following his April 8, 2002 injury, Plaintiff reported to Dr. Robert A. Barefoot of Loris Healthcare System on April 9, 2002, with complaints of low and mid-back pain, as well as discomfort in his neck, left ankle and left knee. Dr. Barefoot's examination revealed mild spondylosis in the back and lateral soft tissue swelling in the ankle. X-rays of the left ankle showed soft tissue injury. Plaintiff was instructed to receive follow-up care at Coastal Orthopaedic Associates.
10. On April 18, 2002, Plaintiff reported to Dr. William L. Mills of Coastal Orthopaedic Associates with complaints of bilateral knee pain, neck pain, left arm numbness, left ankle pain and swelling, low back pain, and right leg pain. Dr. Mills noted that Plaintiff was tender to palpation at the central cervical spine at both paracervical and trapezial muscles and that Plaintiff exhibited significant pain when forward flexing with fingertips and mid-shins. Dr. Mills requested that Plaintiff not return to work until after an MRI study was conducted. An MRI was conducted on May 8, 2002, and revealed evidence of a moderate, asymmetric disc bulge or protrusion to the left of the midline at C5-6 and C7-8. Dr. Mills diagnosed Plaintiff with lumbar spine degenerative disk disease and left C5-6 and C6-7 cervical spine herniations. Dr. Mills prescribed Neurontin and Bextra and noted the possible need for a C7 selective nerve block and a cervical fusion surgery in the future.
11. On August 21, 2002, a C7 selective nerve block was performed. On October 24, 2002, Dr. Mills assessed Plaintiff as significantly tender to palpation at the central cervical and lumbar spine and categorized Plaintiff's symptoms as chronic low back pain as well as central cervical spine pain. On November 11, 2002, Plaintiff received a second lumbar epidural steroid injection from Dr. John A. Bailey. Dr. Bailey noted that Plaintiff has continuing paraspinous muscular tenderness in and around the L1 level.
12. Dr. Mills referred Plaintiff to Dr. Jeffrey C. Wilkins on March 5, 2003, for non-surgical treatment options. Dr. Wilkins treated Plaintiff until July 9, 2003. During his treatment with Dr. Wilkins, Plaintiff underwent physical therapy, but complained of soreness and neck pain resulting from the physical therapy. Dr. Wilkins noted that Plaintiff had reached maximum medical improvement and prescribed Panior and Gabitril for Plaintiff's pain. Dr. Wilkins testified at deposition that Plaintiff still had pain, discomfort and weakness, and could only perform duties within the limitations provided in his physical work performance evaluation. Dr. Wilkins further testified that Plaintiff could only walk occasionally and could not do lowered work while standing or sitting.
13. During his treatment with Dr. Wilkins, Jennifer Trimble, a physical therapist, performed a physical work performance evaluation of Plaintiff on April 3, 2003. Plaintiff successfully completed twenty-one out of twenty-one tasks. Based on the evaluation, the factors underlying Plaintiff's physical limitations were radiating pain symptoms, weakness of the trunk and lower extremities, spasms of the spinal musculature, and difficulty with balance and lower extremity coordination. Ms. Trimble opined that Plaintiff's abilities did not match his job requirements and he did not meet the lifting or mobility requirements of his job. Ms. Trimble also opined that Plaintiff was restricted from kneeling, squatting, stair climbing, walking, ladder climbing, trunk rotation, or doing elevated work while standing, or doing lowered work while standing or sitting. She further opined that Plaintiff would not be able to safely perform activities involving balance in unprotected work environments.
14. On August 8, 2003, Plaintiff returned to Dr. Mills to discuss surgical options and Dr. Mills noted Plaintiff's continuing significant neck, low back, and bilateral leg pain as well as his inability to sleep. Dr. Mills prescribed Vicodin and Remeron. Dr. Mills testified that Plaintiff had chronic neck and low back pain coming from the disc that had continued to bother him on a constant daily basis, and that sitting aggravates this pain. Dr. Mills opined that Plaintiff's pain arose from an annular bulge that was aggravated by the injury and resulted in an annular tear. Dr. Mills further opined that the two-level cervical fusion surgery he recommended for Plaintiff had only a fifty to seventy-five percent chance of success. Dr. Mills opined that Plaintiff has an approximately twenty-five percent permanent partial disability to his back.
15. Dr. Wilkins's note of July 9, 2003, states "the patient said he absolutely would not do surgery until February because he needs to make money." Dr. Wilkins also testified that Plaintiff indicated to him on July 9, 2003, that he would not be able to do the surgery until February because he needed to make money and he had had some issues at home with his wife that left them cash poor. Dr. Wilkins' understanding was that in July 2002, Plaintiff was actively working.
16. Dr. Mills's medical note of October 24, 2002, indicates, "[Plaintiff] is still working on light duty." At that time, it was also Dr. Mills's understanding that Plaintiff was working. Furthermore, Dr. Mills testified that he thought Plaintiff had continued to work for Defendant-Employer after October 24, 2002.
17. Plaintiff described his job duties as including rigorous physical tasks, administrative tasks, and a lot of networking to get contracts. Plaintiff testified that a tobacco contractor must operate a forklift, lift heavy objects for repairs and loading, load trucks, spend hours on the telephone with contractors, spend hours walking on concrete floors, maintain and develop public relations with the tobacco farmers and buyers, and perform a multitude of other administrative tasks and physical tasks.
18. Plaintiff testified that he performed each of these tasks without difficulty prior to his accident, and only needed to employ two drivers and one independent contractor, because he did much of the work himself. He testified that after the accident, he was forced to hire his sister to handle many of the administrative duties, which he previously handled himself and that he increased the hours of his independent contractor, Teresa Elliot, after his injury, since he was not able to get out and function like he did before the injury. Specifically, he testified he is not able to get up into trucks and get on top of loads with clients, he can not lift heavy objects for repair and loading; he is not able to meet with people the way he used to and he has lost business because of his injury. Plaintiff also testified he is now overdrawn on his line of credit for the first time since he started his business.
19. Plaintiff admitted that prior to his injury he did not drive trucks on delivery runs, go with drivers when they picked up tobacco from the warehouse or make deliveries to customers, and he was not responsible for bailing tobacco or putting it on trucks.
20. At her deposition, Teresa Elliot testified that she had never seen Plaintiff operate equipment and that Plaintiff did not load trucks, operate forklifts, or weld or maintain equipment. She testified that Defendant-Employer had several mechanics that had been working with the company since she had been there. Ms. Elliot further testified that prior to Plaintiff's injury, she saw him on a forklift "very seldom and not for very long because he always had somebody else doing the job," and that in the five years she had been with the company, Plaintiff's involvement in the tobacco market had been to oversee the process.
21. Ms. Elliot works in the tobacco warehouse, located a distance away from Plaintiff's business, five days a week during the tobacco seasons. Tobacco seasons are from July through October for flue cured tobacco and November through February for burley tobacco. She normally would see Plaintiff at the warehouses approximately twice a year. She testified that when Plaintiff goes to the warehouses, he simply talks to people. She also testified, although Plaintiff went to the warehouses where the trucks are loaded, he would not stay long. Ms. Elliot had never seen Plaintiff lift anything or move anything at the warehouse.
22. Ms. Elliot puts tags on the tobacco for the companies that purchase the tobacco. The trucks are loaded at warehouses and the drivers deliver the tobacco to the buyers. People who work in the warehouse do the loading of the trucks. Ms. Elliot scanned the tobacco but did not lift or load it. She spoke with customers to coordinate the oversight of the loading of tobacco onto the trucks and made sure the deliveries were made properly.
23. Plaintiff testified that he had to hire additional workers to offset the work he could no longer perform. He testified that he hired Ms. Elliot after his accident in April 2002; however, Ms. Elliot testified she started working for Defendant-Employer in 1998. Plaintiff did hire Ms. Elliot to come to his place of business to do some paperwork around the time of Plaintiff's injury.
24. The testimony of Ms. Elliot on what Plaintiff's work duties at his place of business were is afforded little weight, as she testified that she normally worked in the tobacco warehouse and would have had limited opportunity to observe Plaintiff's activities at his place of business during the periods she was present. She also had little opportunity to observe Plaintiff's activities at the warehouse since she testified, she would see Plaintiff at the warehouses approximately twice a year and Plaintiff would usually be in the warehouse for only five to ten minutes per visit.
25. Plaintiff also testified he hired his sister as a bookkeeper and that prior to April 2002, he did not have a bookkeeper. However, Plaintiff also testified that prior to April 2002, his wife helped with the bookkeeping and that his wife stopped working for the business when they separated.
26. Mr. Milton Archer and Mr. Ulises Villanueva of Corporation Surveillance and Investigations conducted surveillance on Plaintiff. Mr. Archer performed surveillance on September 2, 2003, at Defendant-Employer's Swamp Fox Road site. During the course of the day, Plaintiff made several trips, including trips to a restaurant, two banks, and to a tobacco warehouse. Mr. Archer did not note Plaintiff having any physical problems getting into and out of his truck.
27. Mr. Villanueva also performed surveillance on July 17, 2003, and on August 8, 2003, at the Defendant-Employer's Swamp Fox Road location. Mr. Villanueva observed Plaintiff talking on a telephone, operating a forklift and carrying a small child. During these activities, Mr. Villanueva did not observe Plaintiff having difficulty walking or performing these activities.
28. The credible evidence of the record, including Plaintiff's own testimony reveals that after the injury, he continued to actively solicit business, take orders from customers, speak with customers regarding problems that other employees could not handle, hire and fire employees as necessary, authorize all bills that were paid by the company, order supplies for the business, make decisions about the upkeep on the building, and sign employee paychecks. Plaintiff also testified that he still visited his operation to meet with customers and provided oversight. Plaintiff has even traveled after his injury on business to Kentucky and Tennessee.
29. Further, Plaintiff testified that he stays current about problems facing his business and discusses the matters with his drivers. Plaintiff also testified that he thought he was contributing something to his business and indicated that his current efforts were helping the business to produce money and keep the business stable.
30. Based on the credible evidence of record, Plaintiff continued to perform many of the same job duties he performed prior to his injury, and he continued to provide valuable services to his business. The Full Commission therefore finds that Plaintiff was actively involved in the day-to-day operation of the business and utilized skills that would increase his likelihood of finding employment in the competitive market place, even though his physical limitations resulting from his injury prevented him from performing all of his pre-injury job duties.
31. The Full Commission finds that Plaintiff does have physical limitations resulting from his injury that may have caused a diminution in his business revenue and would likely lessen his employment opportunities and therefore diminish his capacity to earn wages in the competitive marketplace. The Full Commission is unable to determine, based on the evidence presented, the value of the work Plaintiff provided to his business after his injury, but it is clear that Plaintiff's work after his injury kept the business operating and he utilized skills which would enable him to be employable in the competitive marketplace even with his physical limitations caused by his injury. Plaintiff continued to use his business account to pay expenses in the same manner after his injury as he did before his injury, but he appeared to have to pay some of these expenses with money borrowed from his "line of credit." Defendant-Carrier contends that Plaintiff's payment of expenses from his business accounts constituted salary continuation for which they are entitled to a credit. Accordingly, the issue of Plaintiff's wage earning capacity after September 22, 2003, and Plaintiff's entitlement, if any, to partial disability benefits and Defendant-Carrier's entitlement to a credit along with the average weekly wage issue must be reserved for subsequent determination.
32. As of September 22, 2003, the date Defendant-Carrier filed the Form 24 application to stop payment of compensation, the greater weight of the competent and credible evidence establishes that Plaintiff was capable of earning at least diminished wages either in the same employment or other employment.
33. Plaintiff is not entitled to temporary total disability compensation pursuant to N.C. Gen. Stat. § 97-29 after September 22, 2003.
34. Plaintiff may be entitled to partial disability after September 22, 2003; however, the Full Commission needs additional evidence to compute the amount owed, if any.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. As of September 22, 2003, Plaintiff was actively involved in the day-to-day operation of the business and he utilized skills that would enable him to be employable in the competitive marketplace; however, due to his physical limitations resulting from the injury, Plaintiff's capacity to earn wages would likely be diminished. Therefore, Plaintiff is no longer totally disabled, and there is insufficient evidence from which to determine whether he is partially disabled due to his injury. N.C. Gen. Stat. §§ 97-30; 97-29. Lanning v. Fieldcrest, 352 N.C. 98,530 S.E.2d 54 (2000).
2. As of September 22, 2003, the date Defendant-Carrier filed the Form 24 application to stop payment of compensation, the greater weight of the competent and credible evidence establishes that Plaintiff was capable of earning some wages either in the same employment or other employment; however, he had physical limitations resulting from his injury that limited his ability to perform all of the duties which he previously performed. The evidence of record is insufficient to establish the extent to which his wage earning capacity has been diminished. Plaintiff is not entitled to compensation pursuant to N.C. Gen. Stat. § 97-29, after September 22, 2003. N.C. Gen. Stat. § 97-29.
3. As of September 22, 2003, Plaintiff was no longer totally disabled and Defendant-Carrier's Form 24 application to terminate compensation was properly granted.
4. The issues of Defendant-Carrier's entitlement to a credit, if any, for temporary total disability compensation paid to Plaintiff after September 22, 2003, Plaintiff's entitlement, if any, to partial disability due to diminished wage earning capacity after September 22, 2003, and Plaintiff's average weekly wage are reserved. Either party may request a hearing on these issues.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff is not entitled to temporary total disability compensation pursuant to N.C. Gen. Stat. § 97-29 after September 22, 2003. Accordingly, Defendant-Carrier's application to terminate payment of temporary total disability compensation is GRANTED.
2. Defendant-Carrier's entitlement to a credit, if any, for temporary total disability compensation paid to Plaintiff after September 22, 2003, Plaintiff's entitlement, if any, to partial disability due to diminished wage earning capacity after September 22, 2003 and Plaintiff's average weekly wage are reserved. Either party may request a hearing on these issues.
3. Defendant-Carrier shall pay all medical expenses incurred or to be incurred by Plaintiff for reasonably necessary treatment related to his back and ankle injury of April 8, 2002, when bills for the same have been submitted and approved through procedures adopted by the Industrial Commission, for so long as such treatment tends to effect a cure, give relief or lessen Plaintiff's disability.
4. Defendant-Carrier shall pay the costs.
This the __ day of March 2006.
 S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ ___________________ PAMELA T. YOUNG COMMISSIONER
 S/ ___________________ CHRISTOPHER SCOTT COMMISSIONER